## IN THE UNITED STATES DISTRICT COURT FOR
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br> *ex rel* **JOSEPH WADE** <br><br> *Plaintiff* <br><br> v. <br><br> **CERES ENVIRONMENTAL SERVICES, INC.** <br> 6968 Professional Parkway East <br> Sarasota, Florida 34240 <br><br> and <br><br> **TRI COUNTY CONSTRUCTION, LLC** <br> 2425 Nivens Road <br> Benton, MS 39039 <br><br> and <br><br> **THOMPSON CONSULTING SERVICES** <br> 1135 Townpark Avenue, Suite 2101 <br> Lake Mary, Florida 32746 <br><br> and <br><br> **DRC EMERGENCY SERVICES, LLC** <br> 6702 Broadway Street, <br> Galveston, Texas 77554 <br><br> and <br><br> **LOAD MASTERS MANAGEMENT, INC.** <br> 18701 SW 358th Street <br> Homestead, Florida 33034 <br><br> and <br><br> **DEBRISTECH, LLC** <br> 925 Goodyear Boulevard <br> Picayune, Mississippi 19466-3223 <br><br> *Defendants* | Civil Action No. <br><br> 8:19 cv 2186 T 02 AEP <br><br> TO BE FILED UNDER SEAL <br> PURSUANT TO 31 U.S.C. §3730 <br><br><br> **JURY TRIAL DEMANDED** |



TRO-57929
$400

## COMPLAINT

Plaintiff, Joseph Wade ("Wade" or "Relator") brings this *Qui Tam* action to recover fraudulently obtained funds, statutory damages, treble damages, and penalties pursuant to the Federal False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.* ("FCA") and alleges as follows:

## I.    INTRODUCTION

1.    After Hurricanes Irma and Maria devastated Puerto Rico, FEMA awarded Defendants DRC and CES large contracts to provide disaster relief services and debris clearing. DRC and CES in turn subcontracted their responsibilities to various companies, including the other Defendants herein.  FEMA's Debris Management Guidelines, which were incorporated into the contract, specifically defined the requirements for the work to be performed by DRC, CES, and the other Defendants involved in the disaster recovery.

2.    As detailed below, Relator received a subcontract to clear roadways by removing trees and tree branches that either blocked the roadways or posed a risk of breaking / falling onto roadways (collectively "Tree Cutting").  The standards for Tree Cutting are established by FEMA's Debris Management Guidelines.  Shortly after arriving in Puerto Rico, it became clear to Realtor that very few trees were actually damaged in a way that blocked roadways or posed a threat to roadways, as required by the FEMA contract.  Despite this, DRC, CES, and the other Defendants instructed their subcontractors, including the Relator, to cut trees far from the road which posed no risk to roadways; to bill on a per-branch basis instead of a per-tree basis; to cut and remove trees that were not damaged by the hurricanes; and to cut branches that posed no risk of breaking (let alone breaking onto a roadway) – all in violation of the FEMA contract.  They then falsified records and billed FEMA for these unnecessary and non-conforming services and for other services that were not provided.  One week into the recovery process, Relator conveyed his

2

concerns to the owner of Tri County Construction, one of the companies responsible for supervising his work. Almost immediately thereafter, Relator's subcontract was terminated. This lawsuit results.

## II.    JURISDICTION AND VENUE

3.    This is a civil action arising under the laws of the United States, specifically, the "False Claims Act" or "FCA." This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337.

4.    Each of the Defendant corporations listed below is organized under the laws of one of the 50 states, thus this Court has jurisdiction over each of the Defendants pursuant to the national jurisdiction provision of 31 U.S.C. § 3732.

5.    Venue is proper in the Middle District of Florida pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391 because Defendant Ceres Environmental Services, Inc. ("CES") maintains a business office in this district at 6968 Professional Parkway East, Sarasota, Florida, and regularly conducts business in this District from its Sarasota offices. Thus it "can be found" in this District pursuant to 31 U.S.C. § 3732.

## III.    THE PARTIES

6.    Plaintiff, Joseph Wade ("Wade", "Relator" or "Plaintiff") was a debris removal subcontractor for the Defendants during the FEMA hurricane recovery efforts in Puerto Rico. Wade is filing this FCA action as a "Relator" under 31 U.S.C. § 3279, *et seq.* based upon first-hand knowledge of the unlawful conduct set forth below. His address is not being provided to protect his privacy interests.

7.    Defendant, Ceres Environmental Services, Inc. ("CES") is a Minnesota corporation with offices located at 6968 Professional Parkway East, Sarasota, Florida 34240, duly registered

3

to conduct business in the State of Florida.  CES operates a disaster recovery company and contracted with FEMA to provide disaster recovery services as part of the Puerto Rico hurricane recovery.

8.     Defendant, Tri County Construction, LLC ("Tri County") is a Mississippi corporation that provides debris removal services.  Tri County was CES's primary subcontractor and entered into agreements with subcontractors, including Wade, to provide debris removal services in the Puerto Rico hurricane recovery efforts under CES's FEMA contracts.  Tri County maintains its principal place of business at 2425 Nivens Road, Benton, MS 39039.

9.     Defendant, Thompson Consulting Services LLC ("TCS") is a Delaware corporation that provided debris removal monitoring services (i.e., quality control services) in the Puerto Rico hurricane recovery efforts under the above-referenced FEMA contracts.  TCS is duly registered to conduct business in the State of Florida and maintains its principal place of business in Florida at 1135 Townpark Avenue, Suite 2101, Lake Mary, Florida 32746.

10.     Defendant, DRC Emergency Services, LLC ("DRC") is an Alabama disaster recovery corporation that participated in the Puerto Rico hurricane recovery efforts, with its principal place of business located at 6702 Broadway Street, Galveston, Texas 77554.  DRC is duly registered to conduct business in the State of Florida and contracted with FEMA to provide disaster recovery services as part of the Puerto Rico hurricane recovery.

11.     Defendant, Load Masters Management, Inc. ("LMM") is a Florida corporation that provides debris removal services.  LMM was DRC's primary subcontractor and in turn entered into agreements with subcontractors, including Wade, to provide debris removal services in the Puerto Rico hurricane recovery efforts pursuant to DRC's FEMA contract.  LMM maintains its principal place of business at 18701 SW 358th Street, Homestead, Florida 33034.

12.     Defendant, DebrisTech, LLC ("DebrisTech") is a Mississippi company that also provided debris removal monitoring services in the Puerto Rico hurricane recovery efforts under the above-referenced FEMA contracts.  DebrisTech maintains its principal place of business at 925 Goodyear Boulevard, Picayune, Mississippi 39466 and is duly registered to conduct business in the State of Florida.

## IV.   RELEVANT FACTS

### Relator's Connection to Defendants and Scope of Work

13.     Starting in September and October 2017, FEMA provided in excess of five billion dollars in public assistance to Puerto Rico to cover costs related to recovery efforts from Hurricanes Irma and Maria pursuant to 42 U.S.C. § 5121 *et seq.*

14.     Defendant DRC was awarded a large debris removal contract by FEMA to provide disaster relief services in Puerto Rico.  DRC's services for FEMA were expressly subject to the terms and standards contained in the FEMA Public Assistance Debris Management Guide[1] and the FEMA Fact Sheet DAP9580.204 (attached as Exhibit "A").

15.     DRC contracted with Defendant LMM to provide some of those disaster relief services on behalf of DRC.

16.     LMM subcontracted certain Tree Cutting work in Puerto Rico to Relator as set forth more fully below.

17.     DebrisTech provided debris monitoring services to DRC / LMM subcontractors, including Relator, whereby it identified the Tree Cutting that Realtor was to perform and documented the Tree Cutting for submission by the debris removal contractors to FEMA for payment.

---

[1] Because of its size, we have not attached the FEMA Public Assistance Debris Management Guide as an exhibit. The guide can be accessed directly from FEMA at: https://www.fema.gov/pdf/government/grant/pa/demagde.pdf

18.     Defendant CES was also awarded a large debris removal contract from FEMA to provide disaster relief services in Puerto Rico.  CES's services for FEMA were likewise expressly subject to the terms and standards contained in the FEMA Public Assistance Debris Management Guide and the FEMA Fact Sheet DAP9580.204.

19.     CES contracted with Defendant Tri County to provide some of those disaster relief services on behalf of Ceres.

20.     Tri County subcontracted certain Tree Cutting work in Puerto Rico to Relator as set forth more fully below.

21.     TCS provided monitoring services to CES / Tri County subcontractors, including Relator, whereby it identified Tree Cutting that Realtor was to perform and documented the Tree Cutting for submission by the debris removal contractors to FEMA for payment.

22.     Debris monitors like TCS and DebrisTech are "meant to ensure that the debris removal contractor is performing the scope of work required by the contract, and to document the debris removal operations."[2]

23.     Debris monitors are also responsible for "Validat[ing] hazardous trees, including hangers, leaners, and stumps" in the field.[3]

24.     Based on FEMA's guidelines, Relator was only permitted to completely cut down trees that were greater than six inches in diameter that were leaning in a way that they could fall onto a roadway ("Leaners").[4]

---

[2] See FEMA Public Assistance Debris Management Guide, at pg. 107.  The guide can be accessed at the link in FN1
[3] See FEMA Public Assistance Debris Management Guide, at pg. 107.
[4] See FEMA Fact Sheet DAP9580.204 at pg. 2, attached hereto as **Exhibit "A"**.

25.     Based on FEMA's guidelines, Relator was also only permitted to cut down tree limbs that were greater than two inches in diameter that were broken and hanging over or near a roadway in a way that they could fall onto a roadway ("Hangers").[5]

26.     Relator understood that he was to cut Hangers on a "per-tree basis" meaning that irrespective of whether he cut one or more Hangers from a single tree, they were only to be billed as one Hanger.[6]

27.     Relator's employees were assigned to debris monitors, who accompanied their trucks to identify Leaners and Hangers that Relator's company could cut pursuant to the FEMA contract.

28.     Each time one of the TCS monitors identified a Leaner or Hanger, a ticket was created documenting the nature of the hazard, i.e. whether it was a Leaner or a Hanger, the tree/branch diameter, the date and time of the ticket, and the latitude and longitude of the Hanger or Leaner (the "Ticket").

29.     Each TCS Ticket contained the name of the monitor, the monitor's device number, the project name, and the company for which Relator is subcontracted.

30.     However, DebrisTech tickets only contained a bar code and ticket number and would have to be matched to DebrisTech's internal systems to provide the data required for billing FEMA – Relator marked the DebrisTech tickets with "L" and "H" for Leaner or Hanger.

31.     Shortly after starting work, Relator saw that there few Leaners or Hangers that met FEMA standards in Puerto Rico, and inquired whether they would have enough work.

---

[5] *See* Ex. A, at pg. 3.
[6] *See* Ex. A, at pg. 3.

32.     He was assured by the monitors that there would be sufficient work and that there would be a large quantity of Leaners and Hangers for his team to cut.

33.     However, the majority of the Hangers and Leaners that monitors DebrisTech and TCS identified intentionally did not meet the qualifications set forth in Exhibit A.

34.     Specifically, and as set forth more fully below, the monitors regularly and intentionally identified Leaners and Hangers that were too far from the road to actually fall onto the roadway if they were to collapse.  These Leaners and Hangers thus did not meet FEMA standards and were identified solely in order to inflate the Defendants' bills to FEMA.

### Relator's First Hand Knowledge

35.     Relator arrived in Puerto Rico in or about January of 2018, with several trucks to provide Tree Cutting work pursuant to a subcontract he received from LMM, which itself was a subcontractor of DRC.

36.     Immediately upon arriving, Realtor noticed that the contract's fifty-five (55') foot minimum bucket truck size was not enforced and that most trucks could only achieve a maximum height of twenty-five (25') to thirty-five (35') feet.

37.     On Relator's first day working on the LMM subcontract, Relator and the DebrisTech monitor assigned to his team were only able to find two trees that met the definitions of the contract and, as a result, only had two Tickets.

38.     Relator called his LMM contact, Raul Castro ("Raul") asking what his purpose was in Puerto Rico, because there weren't any trees that met the contract guidelines.

39.     Raul came to Relator's job site and told Relator not to worry and assured him that he would assign him a different monitor the next day.

40.    The next morning, Relator discussed his concerns with other subcontractors at the Vega Baja yard where the work trucks parked overnight.

41.    He was told by other LMM subcontractors that they had in excess of 70 Tickets the prior day.

42.    Those subcontractors told him that if he received an honest monitor, he should notify LMM and a different DebrisTech monitor would be assigned.

43.    LMM in fact assigned a new monitor to Relator's team the next day who identified trees that were not even remotely leaning and posed no risk of falling as Leaners.

44.    Additionally, the monitor identified multiple Hangers in a single tree and billed them as if they were located in different trees.

45.    After Relator was asked to cut multiple Leaners that he did not believe posed any risk and multiple Hangers in the same tree, he began retaining all of his team's Tickets.

46.    Relator knows that DRC and LMM submitted these Tickets to FEMA for payment because Relator received payment for them.

47.    Shortly thereafter, DRC, LMM, and DebrisTech stopped working in Puerto Rico.

48.    During the work stoppage, Relator obtained a new subcontract from Tri County directly from its owner, Jim Davis ("Jim").

49.    Tri County was a subcontractor under CES's contract with FEMA.  The Tri County subcontract was for Tree Cutting and clean-up.  Jim's team did the clean-up, but Tri County needed a bucket truck to perform the Tree Cutting.  Tri County hired Relator to provide the bucket truck and perform the Tree Cutting under CES's FEMA contract.

50.    As a result of the parties working relationship, Jim and his clean-up team followed directly after Relator's Tree Cutting team with a monitor from TCS.

51.    From the first day, Jim and the TCS monitor directed Relator's team to perform unnecessary Tree Cutting services.

52.    Again, Relator was told to cut multiple Hangers in the same tree and Tri-County and TCS billed them as if they were located in different trees.

53.    Relator was also asked to cut Leaners that were deep in the forest and posed no threat to roadways, which Tri-County and TCS again improperly billed to FEMA.

54.    Jim made it clear that he needed to "strike while the iron is hot" and demanded that Relator's team average more than one hundred (100) Tickets per day, even though Tri County and TCS had actual knowledge that those Tickets did not comply with FEMA standards.

55.    Jim also pushed TCS monitors to allow Relator's team to make hundreds of unnecessary cuts.

56.    If a monitor objected or refused, Tri County contacted TCS, and TCS replaced the monitor the next day.

57.    At the end of the first week, Relator told Jim and Tri County that he was not comfortable cutting Hangers and Leaners that obviously and clearly did not need meet the standards of the FEMA contract.

58.    The next day, Realtor was terminated and replaced by another subcontractor.

59.    Relator knows that CES and Tri County submitted these Tickets to FEMA for payment because Relator received payment for them.

60.     Relator organized his CES Tickets by date, entered them into an Excel spreadsheet, and plotted the latitude and longitude on a map.

61.     Additionally, after being terminated from his contracts, Relator returned to Puerto Rico and took photographs of the roads where Defendants' unlawful conduct was the most obvious and egregious.

62.     Relator can perform the same analysis on the DebrisTech Tickets once the Ticket bar codes are matched to their corresponding data.

### The Route 6612 Example

63.     Puerto Rico Route 6612, which connects Route 621 and Route 10 is six hundred and fifty (650) meters long.[7]

64.     The entire length of Route 6612 takes less than one minute to drive and less than ten minutes to walk.

65.     When Realtor and his team arrived at Route 6612, it was clear that there were at most a dozen Leaners and Hangers that posed a risk to the small strip of road.

66.     However, over the course of two days, February 6 and February 7, 2018, Relator's two trucks were instructed by Tri State and TCS to make in excess of 90 separate cuts, which Tri State and TCS then submitted to FEMA for repayment under the contract as Leaners and Hangers.[8]

67.     As is clearly evident from the latitude and longitude plots on the map, many of the Leaners and Hangers that were identified by the monitors were not near the road and posed no risk to the roadway.[9]

---

[7] *See* Google Maps Screenshot attached hereto as **Exhibit "B"**.
[8] *See* Spreadsheets and Maps for February 6, 2018 and February 7, 2018 attached hereto as **Exhibit "C"**.  After performing work on Route 6612 on the morning of February 7, 2018, Relator's trucks were sent to a different location, accordingly the irrelevant items have been redacted from spreadsheet and only the relevant maps are attached. *See also* photographs of tickets pertaining to Route 6612 attached hereto as **Exhibit "D"**.
[9] *See* Ex. C.

68.     Additionally, as is clearly evident from the time entries, many of the monitors' tickets occurred from a few seconds to a few minutes from each other, further evidencing that multiple Hangers were being cut from the same tree.

69.     Relator visited Route 6612 after being removed from the contract to take photographs and video of the road and surrounding tree growth.

70.     Relator's photos and video show not only that there are nowhere near ninety (90) trees that meet the diameter standards for Tree Cutting, but that it would be impossible for ninety (90) such trees to pose a risk to the roadway on such a short strip of road.[10]

### Additional Tree Cutting Services

71.     In addition to the Route 6612 maps and spreadsheets, Relator has attached maps and spreadsheets for all the work Relator's teams performed in Puerto Rico with CES, Tri County, and TCS, including Routes 111, 603, 621, and Carretera Las Pinas.[11]

72.     These documents and maps, especially that of Route 111, clearly demonstrate that Defendants' unlawful conduct was widespread and limited to the above detailed route.

73.     Throughout the time that Relator provided Tree Cutting services to DRC, LMM and DebrisTech, more than eighty percent (80%) of the Tree Cutting services performed by his two trucks were unnecessary and did not meet FEMA's requirements for compensable Tree Cutting.

74.     Throughout the week that Relator provided Tree Cutting services to CES, Tri County and TCS, more than eighty percent (80%) of the Tree Cutting services performed by his two trucks were unnecessary and did not meet FEMA's requirements for compensable Tree Cutting.

---

[10] *See* Photographs of Route 6612 attached hereto as **Exhibit "E"** and a video can be provided upon request.
[11] *See* Spreadsheets and Maps for February 7, 2018 through February 14, 2018 attached hereto as **Exhibit "F"**.

75.     Further, based on conversations Relator had with other subcontractors for DRC, LMM, CES and Tri State, Defendants' conduct was widespread and most, if not all, subcontractors were similarly instructed to cut Hangers and Leaners throughout Puerto Rico that did not meet FEMA's requirements, so the Defendants herein could submit inflated bills to FEMA.

76.     Further, based on conversations Relator had with monitors working for TCS and DebrisTech, Defendants' conduct was widespread and it was understood among the monitors that if they refused to issue tickets for unnecessary Tree Cutting services they would be removed from the contract and/or terminated.

### Defendants' Violations of the False Claims Act

77.     Pursuant to 31 U.S.C. §3729(a)(1), "any person who – (A) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly makes uses or causes to be made or used a false record or statement material to a false or fraudulent claim" is liable under the False Claims Act ("FCA").

78.     There are "two categories of false claims under the FCA: a factually false claim and a legally false claim . . . a claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011).

79.     The Defendants in this case knowingly presented both factually and legally false claims to the Government.

13

80.     "[U]nder [the false certification] theory a plaintiff must show that if the Government had been aware of the defendant's violations of the laws and regulations that are the bases of a plaintiff's FCA claims, it would not have paid the defendant's claims." *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 147 (E.D. Pa. 2012).

81.     As set forth herein, Defendants provided false and fraudulent information to FEMA (an agent of the United States) resulting in fraudulent claims for payments from the FEMA disaster relief fund.

82.     Specifically, the Defendants identified Leaners and Hangers that did not need to be cut under FEMA standards and instructed subcontractors, including Relator, to cut them.

83.     Defendants had actual knowledge that those Leaners and Hangers did not meet the qualifications for cutting and instructed their subcontractors for perform the cuts for the express purpose of submitting false claims to the United States for payment.

84.     In addition, upon information and belief, the monitors – TCS and DebrisTech – and the contractors for which they provided services – Defendants CES, Tri County, DRC and LMM – knowingly and purposely instructed subcontractors such as Relator to cut Leaners and Hangers that did not need to be cut for the express purpose of submitting false claims to the United States for payment, so they could maximize the revenue generated from their FEMA contracts.

85.     Upon information and belief, Defendants falsely certified that their work was compliant with FEMA's Debris Management Guide[12] and FEMA's DAP9580.204 Fact Sheet pertaining to cutting Leaners and Hangers.[13]

---

[12] *See* Ex. A. FEMA Public Assistance Debris Management Guide which can be accessed at the website: https://www.fema.gov/pdf/government/grant/pa/demagde.pdf

[13] See Ex. A.

86.     The Defendants knew at the time they submitted their Tickets for payment to FEMA that their work was non-compliant with FEMA's payment requirements and willfully hid that non-compliance to fraudulently induce FEMA to pay the submitted tickets.

87.     The Defendants also knew at the time they submitted their Tickets for payment to FEMA that the false compliance information they provided to FEMA was material to the government's payment decision and that FEMA would not have paid the submitted claims had the Defendants disclosed the true facts behind each submission.

88.     The false and fraudulent information that the Defendants provided to FEMA was in fact material to FEMA's decision to pay the Defendants' claims, and FEMA did in fact pay the false claims submitted by the Defendants without knowledge of their falsity.

89.     As a result, Defendants received federal funds for cutting Leaners and Hangers, which it was not be entitled to receive under the terms of the FEMA contract and would not have received if FEMA had known that the Defendants were not compliant with the terms of FEMA's Debris Management Guide and DAP9580.204 Fact Sheet.

90.     Defendants' claims were false or fraudulent and its officers and authorized agents knew its claims were false or fraudulent but nevertheless engaged in such conduct in an effort to generate as much revenue as possible from FEMA's disaster relief fund.

91.     As a direct and proximate result of express and implied false certifications made to the Government in exchange for payment by FEMA, the Government paid Defendants millions of dollars.

92.     As a direct and proximate result of the false fraudulent statements made by Defendant as set forth in this Complaint, the U.S. suffered millions of dollars in damages and is entitled to full compensation plus a civil penalty of up to $11,000 per FCA violation.

93.     Over the course of Relator's work with the Defendants, Relator received, and FEMA paid, hundreds of false Tickets under both the CES and DRC contracts.[14]

94.     Of those Tickets, between eighty and ninety percent evidence Tree Cutting that the Defendants directed the Relator to perform and billed to FEMA even though they had actual knowledge the subject Tree Cutting was unnecessary and did not comply with FEMA requirements.

95.     Relator is confident that upon further investigation, the Government will uncover tens of thousands, if not hundreds of thousands, of false tickets / submissions by the above-named Defendants – as well as other contractors and subcontractors of CES and DRC – that evidence demonstrably false and fraudulent Tree Cutting services.

## COUNT I

## VIOLATION OF 31 U.S.C. § 3729 *et seq.*

96.     Relator repeats and incorporates paragraphs 1 through 95 above as if fully set forth herein.

97.     Relator's claims arise under the False Claims Act ("FCA") at 31 U.S.C. § 3729 *et seq.*

98.     Defendants violated the FCA when they instructed Relator to engage in unnecessary Tree Cutting services and sought reimbursement of those services from the Federal Government.

99.     Defendants also violated the FCA when they instructed their other contractors and subcontractors to engage in unnecessary Tree Cutting services and sought reimbursement of those services from the Federal Government.

---

[14] See **Exhibit "E"**; tickets from February 7 through February 14 attached hereto as **Exhibit "G"**; and DebrisTech tickets attached hereto as **Exhibit "H"**.

16

100.    As described above, the scheme caused millions of dollars in claims to be submitted under the FEMA disaster relief program for services that did not need to be provided and would not have been provided absent Defendants' fraud.

101.    Defendants' knowingly false statements were relied on by the Federal Government when they submitted and paid claims for Tree Cutting services.

102.    As a result, the Federal Government paid for Defendants disaster relief services, which it would not have paid if it were aware of Defendants fraudulent conduct as set forth above.

**WHEREFORE,** Relator Wade respectfully requests that this Court award the following damages to the following parties and against Defendant:

To the UNITED STATES:

a)  Three times the amount of actual damages which the United States Government sustained as a result of Defendants' submission of false claims;

b)  A civil penalty of up to $11,000 per violation for each false claim Defendant presented or caused to be presented to the United States for payment;

c)  Prejudgment interest; and

d)  All costs incurred in bringing this action.

To RELATOR WADE:

a)  The maximum amount allowed pursuant to 31 U.S.C.A. § 3730(d) and/or any other applicable provision of law;

b)  Reimbursement for reasonable expenses which Plaintiff incurred in connection with this action;

c)  An award of reasonable attorneys' fees and costs; and

d)  Such further relief as this Court deems equitable and just.

17

## COUNT II

## CONSPIRACY TO VIOLATE 31 U.S.C. § 3729 *et seq.*

### CES, Tri County, and TCS

103.   Relator repeats and incorporates paragraphs 1 through 95 above as if fully set forth herein and states:

104.   Relator's claims arise under the False Claims Act ("FCA") at 31 U.S.C. § 3729 *et seq.*

105.   Defendants Tri County and TCS knowingly conspired with CES to submit false and fraudulent claims to FEMA for unnecessary Tree Cutting services.

106.   Specifically, with CES's knowledge, consent, and direction, Tri County, through Jim Davis, met with FEMA monitor TCS and reached an agreement whereby TCS would certify that the false and fraudulent Tree Cutting being performed by Tri County and CES met FEMA contract standards, when all three conspirators knew that it did not.

107.   The purpose of the conspiracy was to increase the revenue received by all three companies from FEMA through FEMA's payment of non-compliant claims.

108.   In furtherance of the conspiracy, TCS sent compliant monitors to CES/TCS cutting sites who would approve false Tickets and would change out those monitors at TCS's request when TCS believed the supplied monitor did not approve a sufficient number of false Tickets.

109.   Relator witnessed the above-referenced actions between TCS and Tri County directly and was paid for fraudulent Tickets sent by TCS to CES and submitted by CES to FEMA for payment, and therefore knows that CES in fact submitted said fraudulent Tickets to FEMA for payment and was paid for them.

110.   As a result, Defendants received federal funds for cutting Leaners and Hangers, which it was not be entitled to receive under the terms of the FEMA contract and would not have received if FEMA had known that the Defendants were not compliant with the terms of FEMA's Debris Management Guide and DAP9580.204 Fact Sheet.

111.   As described above, this scheme caused millions of dollars in claims to be submitted under the FEMA disaster relief program for services that did not need to be provided and would not have been provided absent Defendants' fraud.

112.   Defendants' knowingly false statements were relied on by the Federal Government when they submitted and paid the false claims for Tree Cutting services.

113.   As a result, the Federal Government paid for Defendants disaster relief services, which it would not have paid if it were aware of Defendants fraudulent conduct as set forth above.

**WHEREFORE,** Relator Wade respectfully requests that this Court award the following damages pursuant to 31 U.S.C. § 3729 *et seq.* against the above-named Defendants:

To the UNITED STATES:

e)  Three times the amount of actual damages which the United States Government sustained as a result of Defendants' submission of false claims;

f)  A civil penalty of up to $11,000 per violation for each false claim Defendant presented or caused to be presented to the United States for payment;

g)  Prejudgment interest; and

h)  All costs incurred in bringing this action.

To RELATOR WADE:

e)  The maximum amount allowed pursuant to 31 U.S.C.A. § 3730(d) and/or any other applicable provision of law;

f)  Reimbursement for reasonable expenses which Plaintiff incurred in

connection with this action;

g) An award of reasonable attorneys' fees and costs; and

h) Such further relief as this Court deems equitable and just.

## COUNT III

### CONSPIRACY TO VIOLATE 31 U.S.C. § 3729 *et seq.*

### DRC, LMM, and DebrisTech

114.    Relator repeats and incorporates paragraphs 1 through 95 above as if fully set forth herein and states:

115.    Relator's claims arise under the False Claims Act ("FCA") at 31 U.S.C. § 3729 *et seq.*

116.    Defendants LMM and DebrisTech knowingly conspired with DRC to submit false and fraudulent claims to FEMA for unnecessary Tree Cutting services.

117.    Specifically, with DRC's knowledge, consent, and direction, LMM met with FEMA monitor DebrisTech and reached an agreement whereby DebrisTech would certify that the false and fraudulent Tree Cutting being performed by LMM and DRC met FEMA contract standards, when all three conspirators knew that it did not.

118.    The purpose of the conspiracy was to increase the revenue received by all three companies from FEMA through FEMA's payment of non-compliant claims.

119.    In furtherance of the conspiracy, DebrisTech sent compliant monitors to DRC/LMM cutting sites who would approve false Tickets and would change out those monitors at LMM's request when LMM believed the supplied monitor did not approve a sufficient number of false Tickets.

20

120. Relator witnessed the above-referenced actions between DebrisTech and LMM directly and was paid for fraudulent Tickets sent by LMM to DRC and submitted by DRC to FEMA for payment, and therefore knows that DRC in fact submitted said fraudulent Tickets to FEMA for payment and was paid for them.

121. As a result, Defendants received federal funds for cutting Leaners and Hangers, which it was not be entitled to receive under the terms of the FEMA contract and would not have received if FEMA had known that the Defendants were not compliant with the terms of FEMA's Debris Management Guide and DAP9580.204 Fact Sheet.

122. As described above, this scheme caused millions of dollars in claims to be submitted under the FEMA disaster relief program for services that did not need to be provided and would not have been provided absent Defendants' fraud.

123. Defendants' knowingly false statements were relied on by the Federal Government when they submitted and paid claims for Tree Cutting services.

124. As a result, the Federal Government paid for Defendants disaster relief services, which it would not have paid if it were aware of Defendants fraudulent conduct as set forth above.

**WHEREFORE,** Relator Wade respectfully requests that this Court award the following damages pursuant to 31 U.S.C. § 3729 *et seq.* against the above-named Defendants:

To the UNITED STATES:

i) Three times the amount of actual damages which the United States Government sustained as a result of Defendants' submission of false claims;

j) A civil penalty of up to $11,000 per violation for each false claim Defendant presented or caused to be presented to the United States for payment;

k) Prejudgment interest; and

21

l)   All costs incurred in bringing this action.

To RELATOR WADE:

i)   The maximum amount allowed pursuant to 31 U.S.C.A. § 3730(d) and/or any other applicable provision of law;

j)   Reimbursement for reasonable expenses which Plaintiff incurred in connection with this action;

k)   An award of reasonable attorneys' fees and costs; and

l)   Such further relief as this Court deems equitable and just.

Dated:  August 20, 2019

Respectfully submitted,

Gavin P. Lentz, Esquire
Anton Kaminsky, Esquire
**BOCHETTO & LENTZ, P.C.**
1524 Locust Street
Philadelphia, PA  19102
(215) 735-3900
glentz@bochettoandlentz.com
akaminsky@bochettoandlentz.com
*Attorneys for Relator Joseph Wade*

and

**EATON & WOLK, P.L.**
2665 South Bayshore Drive,
Suite 609
Miami, Florida 33133
Telephone:     305-249-1640
Telecopier:     786-350-3079
Email: wwolk@eatonwolk.com
            cmartinez@eatonwolk.com

By:  /s/ William G. Wolk
        WILLIAM G. WOLK
        FBN: 0103527